Filed 12/31/13  P. v. Aslam CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>JAVED ASLAM,<br><br>        Defendant and Appellant. | A132445<br><br>(Alameda County<br>  Super. Ct. No. C163828) |
| In re JAVED ASLAM,<br><br>        on Habeas Corpus. | A137222 |

This is an appeal from judgment after a jury convicted defendant Javed Aslam of committing a lewd or lascivious act on a child under age 14 and, while released on bail, committing three counts of dissuading a witness and engaging in unlawful sexual intercourse.  Defendant challenges the judgment on a variety of grounds, including violation of his constitutional right to a speedy trial, violation of his constitutional right of confrontation due to the admission of the victim's preliminary hearing testimony and statements to police, failure to instruct the jury on accomplice testimony, insufficiency of evidence to prove witness dissuasion and improper assessment of fines.  This matter is remanded to the trial court for determination of the appropriate fines and assessments to be levied against defendant for his commission of a lewd act against a child younger than 14 years.  In all other regards, we affirm the judgment.

1

## FACTUAL AND PROCEDURAL BACKGROUND

On June 1, 2010, defendant was charged by information with one count of committing a lewd or lascivious act on a child under age 14 (Pen. Code, § 288, subdivision (a).)[1] On July 9, 2010, defendant was charged by information with one count of engaging in unlawful sexual intercourse (§ 261.5, subd. (c)), three counts of dissuading a witness (§ 136.1, subd. (a)(1)), and one count of making criminal threats (§ 422). This information further alleged defendant committed all five counts while released on bail or on his own recognizance (§ 12022.1). An amended information was thereafter filed that consolidated the charges against defendant.

A trial began on November 9, 2010, which, after twelve days and before completion of testimony, resulted in a mistrial for a conflict of interest. A second trial thus began in April 2011, at which the following evidence was presented.[2]

## I.      The Lewd Act Committed on May 3, 2006.

At about 8:00 p.m. on May 3, 2006, the Oakland Police Department received information that R.L., a 13-year-old runaway, was at a motel in Oakland. Officer James Saleda, an investigator for the child exploitation unit, thus went with a key card to Room 107 at the motel, R.L.'s suspected location, and knocked on the door. Less than a minute later, R.L. opened the door while still cinching her belt in the company of defendant. R.L. acknowledged having just engaged in sexual intercourse with defendant.

The officer took R.L. outside, where she acknowledged agreeing to have sex with defendant in exchange for $100 in the motel room rented by her "pimp." A subsequent search of the motel room revealed the following physical evidence: an unused condom,

---

[1]     Unless otherwise stated herein all statutory citations are to the Penal Code.

[2]     Before the retrial, on April 25, 2011, a second amended information was filed identifying and renumbering the charges as follows: committing a lewd or lascivious act on a child under 14 on May 3, 2006 (count one); dissuading a witness on March 30, 2010 (count two), March 31, 2010 (count three) and between April 1 through 30, 2010 (count four); unlawful sexual intercourse on April 30, 2010 (count five), and making criminal threats (count six). As before, the second amended information alleged counts two through six were committed while defendant was released on bail or on his own recognizance.

2

business cards on the bed, a used condom and wrapper (same brand as the unused condom) in a trash can, and a pair of men's underwear in the toilet tank. Defendant, who was found concealing underwear in the toilet tank and was later determined not to be wearing underwear, was arrested, although he was later released without being charged after undergoing a sexual assault examination and blood collection.

Crime lab analysis resulted in the following findings. Sperm cells found inside the used condom came from a single donor. Defendant could not be eliminated as the donor of either these sperm cells or of epithelial cells also found inside the condom. The DNA testing of these cells matched defendant with a profile occurring with the frequency of one in 16 trillion. With respect to the sperm and epithelial cells found outside the condom, defendant again could not be eliminated as a donor. The DNA testing of these cells matched R.L. with a profile occurring with the frequency of one in 492 billion.

Defendant was charged with count one on February 13, 2007, after the DNA test results came out, and was arrested in March 2009, when police were finally able to serve him the warrant. Defendant was then released on bail, which was exonerated March 2, 2010, and then was released on his own recognizance through May 2010.

## II. Acts of Witness Dissuasion Occurring in March and April of 2010.

Defendant called R.L.'s mother (Mother), on March 30, 2010, identifying himself as an employee of the Oakland Police Department. Defendant offered Mother $11,000 to take R.L. outside California to avoid being subpoenaed and providing testimony at an upcoming hearing. Defendant warned Mother that organizations were watching them and would make sure R.L. would not "make it to trial." Defendant also recited Mother's social security number and told her he knew where her family lived and other vital information about them, and would be able to find anyone she named. Defendant warned Mother that, should R.L. testify at the hearing, problems would arise and R.L. would be placed in danger. Mother thereafter agreed to meet defendant.

Mother first met defendant the next day, March 31, 2010, between 11:00 a.m. and 1:00 p.m. at Keller Plaza in Oakland. Once she arrived, she received a phone call and saw defendant's car pull into the lot and park about three spaces away. After leaving his

3

vehicle, defendant approached Mother and told her one of his relatives or friends (the person Mother believed was on trial) had gotten caught up in a situation, and that he was innocent. Defendant further told Mother that he worked with a Mafia-like organization more powerful than the government, and that he would find out if she contacted the police. To demonstrate this, defendant used his computer to find contact information regarding a person Mother had not seen for years. Defendant stated, however, that he preferred to work with her in a "nice way," and thus gave her $1,000 to leave for the weekend and to "lay low" with R.L. to avoid being subpoenaed or forced to testify. Mother did not know where R.L. was, but nonetheless left on her own for a previously-planned weekend trip.[3]

In April 2010, after Mother returned from her weekend trip, defendant called her again to discuss a possible trip by Mother and R.L. to visit family in Texas. Defendant offered to pay for the trip and suggested she find a job there. Mother understood the purpose of this trip was, again, to avoid being subpoenaed or forced to testify in a trial. She met with defendant at an Oakland McDonald's on April 13, 2010 where they further discussed the details of this trip, and defendant offered to give her another $1,000 for living expenses in addition to paying for R.L.'s and her tickets to Texas.

Sometime before April 20, 2010, Mother met defendant at the Oakland Amtrak station, where he gave her money for tickets to Texas. Mother bought tickets for herself and her youngest son. Mother wanted defendant to think R.L. was going with her because she was scared and "[f]or [R.L.'s] safety." However, Mother could not control R.L. at that time so, although R.L. knew Mother wanted her to go to Texas, R.L. did not go. Thus, on April 20, Mother and her son travelled as planned, staying several days in Texas before returning May 3 to Oakland. During her time away, Mother spoke several

---

[3]     Defendant's wife, Sharma, later testified to the contrary that defendant was with her during the period of 11:00 a.m. to 1:00 p.m. on March 31, 2010, first at her sister-in-law's office and then at a school event for their son (for which she produced a photograph).

4

times by phone to defendant and to R.L., advising her to "stay low" until the court hearing was finished.[4]

## III.    The Act of Unlawful Sexual Intercourse Committed on April 30, 2010.

R.L. did not have direct contact with defendant following the May 3, 2006 incident until March 2010, when Mother gave him her phone number.  Around that time, defendant and R.L. had a few phone conversations and made plans to meet, but R.L. did not show up until April 30, 2010, when she called defendant and told him she was hungry and wanted to meet.  They met about 6:00 p.m. in Berkeley, first stopping at Wal-Mart before going to a Motel 6 in Oakland and renting a room. There, R.L. performed oral sex on defendant before engaging in intercourse.  Defendant paid R.L. and, about one hour later, they went to a fast food restaurant before returning to Berkeley.

## IV.    Further Contacts between Defendant, R.L. and Mother during May 2010 and the Subsequent Police Investigation.

In May 2010, after Mother returned from Texas, defendant again called her and told her to leave town for a month or two because the court hearing had been delayed. When Mother mentioned having friends in Washington, defendant advised her to go there and look for a job and he would pay her rent and give her more money on June 1. Defendant insisted Mother take R.L. along and get her "under control," or they would "take care of her one way or another."

On May 13, 2010, Mother, R.L. and defendant met at the Oakland bus station, where he gave them money for tickets to Yakima, as well as $1,500 for expenses. Although defendant watched them board the bus, R.L. only travelled as far as Sacramento before telling Mother she wanted to return to Oakland.  Keeping $1,000 for herself, Mother gave R.L. $500 and they both returned to Oakland.  Mother called defendant

---

[4]    Sharma, again contradicting Mother's recollections, testified that, on April 13, 14, and 20, she and defendant followed their typical springtime schedule of picking up their children from school at about 2:30 p.m. and then taking them directly to their club activities, where they all remained until about 5:30 or 6:00 p.m., when they returned home.  She produced a photograph of their son playing soccer on April 20 at about 4:00 p.m.

before leaving Sacramento to tell him of the failed plan, after which defendant texted Mother, telling her to call him and not to "play games." After arriving in Oakland early the next morning, R.L. nonetheless left the station with her pimp. Mother warned R.L. the same day to "lay low" before leaving again on a bus for Yakima later in the day.

While still in Washington, Mother received a text from defendant on May 15, 2010, asking whether she had spoken to R.L., referring to himself as the "clean up guy" for the person involved in the court hearing, and stating that if he had been the person involved in the hearing, "she would be dead." The text further stated: "Let me know if you talk to her. Why is she not talking to you? We gave you $1,500 for 15 days and spent $1,000 on your tickets and hotel. We gave you over $4,000 cash in three weeks. Manage your money. As promised we will take care of you. But not - do not lie to us. You did not give money to R.L. this time or when you went to Texas and took $100 for R.L. We know. If I was the guy, she would be dead. We will help you, but don't get me involved in this stupid stuff. She does not know anything. She had [expletive] six guys that night."

Also on May 15, defendant sent a text to R.L. stating, "Go back to your mother or we will cut your throat," and a text to Mother stating, "We spent nearly 5,000. If you or R.L. [expletive] up . . . ." Mother returned to Oakland a few days later on or about May 17, 2010. R.L. later claimed not to recall whether defendant threatened her during this time period.[5]

On May 21, 2010, the preliminary hearing was held on count one, a lewd or lascivious act allegedly committed against R.L. on May 6, 2006. Neither Mother nor R.L. testified, despite the fact that the prosecution had served Mother with a subpoena and had attempted service on R.L. However, after R.L. was arrested on May 25, 2010 for prostitution, she told Officer Saleda during questioning that "they" had received calls "basically telling her not to testify."

---

[5]     Although one of R.L.'s cell phones underwent forensic analysis by the Alameda County Sheriff's Department, no text messages were recovered because the software system used for the analysis was not compatible with R.L.'s phone.

During this May 26, 2010 interview, R.L. also told Officer Saleda about the April 30 incident. Specifically, R.L. confirmed that she had intercourse with defendant at the Motel 6 in Oakland, after which defendant drove her back to Berkeley. Officer Saleda thereafter went to the Motel 6, where he obtained a guest card and registration form dated April 30, 2010 with defendant's personal information, and hotel records indicating that, at about 9:30 p.m. on that date, defendant's credit card was swiped, his license plate recorded, and a key card made for him, and that he checked out later that night.[6]

The next day, Officer Saleda met with Mother to question her about R.L. Mother acknowledged defendant had contacted her and showed Officer Saleda texts she had received from him regarding R.L. Mother agreed to participate in a pretext phone call with defendant, but while they were still setting up the call, defendant called Mother. During this call, which was placed on speaker so Officer Saleda could listen, Mother told defendant the prosecutor had contacted her. Defendant responded that the prosecutor should not be calling her because nothing would happen in the case for over a month. He also told her to get R.L. "in control for us to do whatever. Otherwise, we will."

Following these interviews, Officer Saleda brought new charges against defendant (named in counts two through six), for which a preliminary hearing was held on June 28 and 29, 2010. This time, both Mother and R.L., who was being held at the juvenile justice center, testified.

## V.  Pre-Trial and Trial Proceedings:  September 2010 through April 2011.

In connection with defendant's first trial, Mother was interviewed by both the defense and the prosecution. Specifically, in September 2010, an elderly man with a white beard named Walt Stannard went to Mother's house, identified himself as a defense investigator, and told her that if she needed anything to let him know and he would contact defendant. Then, in a recorded interview on October 23, 2010, Mother told

---

[6]     Sharma confirmed at trial that defendant left home that evening at about 8:15 p.m. and returned about 10:45 p.m., telling her someone had requested his help in finding food and a place to stay.

Stannard she had never met with defendant or received money from him. Mother further stated that she went to Texas with money from a friend, and went to visit other friends in Washington. R.L. accompanied her to Sacramento before deciding to return to Oakland. According to Stannard, Mother did not appear scared during this interview; she appeared to want money and did not want R.L. to have to "go through this." After the interview, Mother left messages for Stannard several times, telling him she was worried about R.L.'s safety and would not cooperate with the district attorney or testify at trial, and asking him for defendant's address to write him. She also asked for assistance so she and R.L. could get away and avoid testifying. After speaking once to Mother to advise her not to call him, Stannard did not return her calls and gave the messages to defense counsel.

Mother also directly called defense counsel several times during and after defendant's first trial, leaving messages or speaking to the receptionist. During these calls, Mother asked questions such as how long trial would last, when "all this" would be over, and why the District Attorney's office was harassing her and telling her she would go to jail if she did not testify. Mother also stated that she would not testify and was out of town, and that she did not want defendant to go to jail for a crime he did not commit. In later calls, Mother questioned whether the attorney had received her messages, whether they had her number and would call her back, or whether they were avoiding her. The receptionist advised Mother that her messages would be given to the attorney, and that, if subpoenaed, she would have a duty to testify.

Also before the first trial, three women separately called Mother to tell her not to testify. One woman offered Mother $11,000 to provide a fake birth date for R.L., and another woman advised her to say her older daughter or niece rather than R.L. was involved in the incident. The third woman told her she was "doing good" by not showing up at trial and would be paid money once trial was over. Mother never received any of this money.

Despite receiving subpoenas, neither R.L. nor Mother testified at defendant's first trial, which began November 9, 2010. The police tried to locate both of them, but could only find Mother.

Mother met with the prosecution's investigator on November 15, 2010, after first speaking with him by telephone several times. During this interview, Mother appeared nervous and hesitant to speak. She told the investigator she did not want to testify because of "what might happen to [R.L.]."

After a mistrial was declared on December 6, 2010,[7] Mother sent an unsigned letter to defendant in jail enclosing her phone number and stating: "Merry Christmas, long time no hear." She later explained wanting to advise defendant that she was complying with his instructions. Jail records reflect that defendant called Mother at the phone number enclosed in Mother's letter on January 9, 2011. Police officers later recovered from defendant's cell the envelope from this letter with Mother's phone number written inside, as well as a list of the names and addresses of jurors from his first trial.

On February 2, 2011, Mother met again with the prosecutor's investigator. Mother expressed further concern regarding her, R.L.'s, and her other daughter's safety. Mother explained that defendant had warned that, if he were found guilty, he would take care of them "in a different way" because he knew where she and her family lived and could find R.L.

Defendant's second trial began a few months later, in April 2011.

## VI.    The Verdict, Sentencing and Appeal.

On May 19, 2011, the jury in the second trial found defendant guilty of all counts except count six (making criminal threats), and found true that defendant committed counts two through five while out of custody on bail. On June 17, 2011, the trial court sentenced defendant to a total term of 14 years and eight months in prison. Defendant filed a timely notice of appeal on June 22, 2011.

---

[7]    This mistrial was the result of a finding of conflict of interest.

**DISCUSSION**

Defendant raises numerous issues on appeal. First, defendant contends he was prejudiced by the trial court's denial of his statutory right to a speedy trial. Second, defendant contends his constitutional right to confront adverse witnesses was violated to his prejudice by the trial court's admission of R.L.'s preliminary hearing testimony regarding the May 3, 2006 incident and her statements to police officers regarding the May 3, 2006 and April 30, 2010 incidents. Further, in the alternative, defendant contends his counsel's failure to object to this evidence from R.L. constituted ineffective assistance of counsel. Third, defendant contends the trial court prejudicially erred by failing to instruct the jury on accomplice testimony. Fourth, defendant contends there was insufficient evidence to support his conviction for dissuading a witness on March 30 and 31, 2010. And finally, defendant contends the court erroneously imposed on him a $800 sex offender fine pursuant to Penal Code, section 290.3. We discuss each of these issues in turn.

## I. Defendant's Statutory Right to a Speedy Trial.

Defendant first contends his right to a speedy trial was violated, requiring dismissal of all charges against him.[8] The trial court rejected his contention below based upon findings that he had impliedly consented to his counsels' waivers of time and that, in any event, there was good cause for delaying his trial. This ruling, generally left to the trial court's discretion, is subject to reversal on appeal only upon a showing of both an abuse of discretion and resulting prejudice to the defendant. (*People v. Johnson* (1980) 26 Cal.3d 557, 569, 575 ["When a defendant has received a fair trial, we believe, neither the public interest nor the scope of article VI, section 13, call for reversal of that

---

[8] Defendant raises the same challenge with respect to the alleged violation(s) of his right to a speedy trial in a writ of habeas corpus filed December 4, 2012. (*In re Aslam*, A137222.) Defendant's writ has by order of this court been consolidated with this appeal, permitting us to decide the speedy trial issue for purposes of both filings in this opinion. By the same order, we deferred determination of whether to issue an order to show cause pending resolution of the issues on appeal. For reasons that follow, we now decide no such order will be made.

conviction because of nonprejudicial error in the scheduling of that trial"]; *People v. Lomax* (2010) 49 Cal.4th 530, 557.)  The relevant facts are as follows.

On December 6, 2010, after a mistrial was declared in the first trial, the trial court relieved attorney David Cohen as defense counsel and advised defendant of his right to another trial within 60 days.  In doing so, the trial court warned defendant that, unless he agreed to a waiver, the amount of time he had to find new counsel would be "very limited."  The next day, December 7, defendant appeared with attorney Gary Sherrer, who had previously appeared on his behalf, and requested to have his case referred to the public defender.  The trial court granted this request, stating for the record: "Time has previously been waived.  It is in a time waived posture."  Attorney Sherrer responded that he did not believe there had been a time waiver, to which the court disagreed, stating: "Time continues to be waived, that's our posture now.  Time is waived, nothing has changed."

On December 16, 2010, attorney Maureen Kildee appeared with defendant and was appointed counsel.  The trial court asked, "Does time continue to be waived," to which Kildee responded: "[Defendant] is willing to waive time right now, but I'd like to maybe set a court date a little sooner than I had intended."  The trial court, in turn, suggested that defendant "pull the time waiver," but Kildee responded that she preferred to "continue to waive time" because the "extremely voluminous" trial transcripts were not yet complete.  Thus, the trial court, without objection, continued the matter until January 14, 2011, and advised both parties to find out when the transcripts would be ready.

At the continued hearing on January 14, 2011, defense counsel informed the court that she had been told by the court reporter that, due to the length of the record and prior commitments, the trial transcripts would not be ready before April 15, 2011. Nonetheless, defense counsel stated, defendant was requesting to pull the time waiver, even if that meant proceeding without the completed transcripts.  Thus, after the court clerk indicated time would run on March 15, 2011, the trial court set a trial date of March 7, 2011. Defendant raised no objection.

11

On February 9, 2011, defendant requested a *Marsden* hearing and, the next day, attorney Donald Foley was appointed to replace Kildee as defense counsel.[9]

On February 24, 2011, defense counsel filed a motion to dismiss pursuant to section 1382, subdivision (a)(2), for failure to commence trial within 60 days of the December 6, 2010, mistrial date. The prosecution filed an objection and, on March 3, 2011, defense counsel stated that, should his motion to dismiss be denied, he would be unable to proceed with the March 7 trial date because he had not yet reviewed the three boxes of evidence from the first trial. Noting the court reporter was under a Court of Appeal order to prioritize another matter that precluded completion of the first trial transcripts until mid-April, defense counsel stated that, even aside from those transcripts, he would not be prepared for trial until mid-May.

On March 7, 2011, after a contested hearing, the trial court denied defendant's motion to dismiss on the following grounds. The trial court agreed defendant did not waive time on December 6, 2010, but found defense counsel (Kildee), exercising her valid authority to control the proceedings, waived time on his behalf and with his implied consent due to his failure to object on December 16, 2010. In addition, the court found defendant impliedly consented to waive time again on January 14, 2011, by failing to object to the setting of the March 7, 2011 trial date. Finally, the court noted that any delay in trial had not prejudiced defendant, particularly given that he, not the prosecution, had requested all previous continuances of the trial date.

Upon the trial court's denial of defendant's motion to dismiss, his counsel requested another continuance of the trial date, stating that he still had not reviewed all three boxes of evidence from the first trial. Defense counsel added that the court reporter could not begin preparing the trial transcripts until April 15, 2011, and, even aside from the transcripts, he needed more time to prepare for trial. The trial court granted the request for continuance after finding it reasonably justified and in defendant's best interests. The trial court thus set a new trial date of April 25, 2011, to which defendant

---

[9]     *People v. Marsden* (1970) 2 Cal.3d 118.

12

objected, arguing that the legal system, which was responsible for court reporting, should have been more protective of his right to speedy trial. Defendant reiterated these concerns for his right to a speedy trial in a letter to the court dated March 16, 2011.

At a March 30, 2011, status review hearing, defense counsel advised the court the transcripts would be ready April 15, 2011, and the trial court maintained the April 25 trial date. Defendant stated he preferred an earlier date; however, the court stood by the April 25 date, noting that good cause for continuance remained given that the transcripts were not yet ready.

On April 19, 2011, defendant wrote another letter to the court, stating that his counsel was refusing his request to file a second motion to dismiss to challenge the court's decision to move his trial date from March 7 to April 25, 2011.

Defendant thereafter stated in court on April 25, 2011, his desire to move to dismiss. The trial court, however, declined to revisit the issue on the ground that it was previously litigated. As such, defendant's second trial began April 25.

On April 26, 2011, defendant brought another *Marsden* motion, which the court denied after a hearing. In response, on May 17, 2011, defendant filed a petition for writ of habeas corpus challenging his counsel's refusal to bring a second motion to dismiss under section 1382, subdivision (a)(2). The trial court, however, denied this petition for failure to state a prima facie case for relief.

It is within this factual and procedural context that we now decide whether defendant's right to a speedy trial was violated to his detriment. We conclude it was not.

A speedy trial is a constitutional right under both federal and state law. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15.) In California, this right is reflected in section 1382, subdivision (a)(2).[10] "The statute requires dismissal of an action if, absent

---

[10] Section 1382, subdivision (a)(2), provides in relevant part:

"(a) The court, unless good cause to the contrary is shown, shall order the action to be dismissed in the following cases: . . . [¶]

"(2) In a felony case, when a defendant is not brought to trial within 60 days of the defendant's arraignment on an indictment or information, . . . or, in case the cause is to be

13

demonstrated good cause, a defendant is not brought to trial within a specified period following arraignment or plea. . . . The action will not be dismissed for delay beyond the specified period, however, if the defendant enters a general time waiver or 'requests or consents to the setting of a trial date beyond the [statutorily prescribed] period.'  (§ 1382, subd. (a)(2)(B) [felony] . . . .)  But '[w]henever a case is set for trial beyond the [initial statutorily prescribed] period by request or consent, expressed or implied, of the defendant without a general waiver, the defendant shall be brought to trial on the date set for trial *or within 10 days thereafter.*' (§ 1382 (a)(2)(B), 3(B), italics added.)" (*Barsamyan v. Appellate Division of Superior Court* (2008) 44 Cal.4th 960, 965 (*Barsamyan*).*)*

Where, as here, a mistrial is declared in a felony case, the statutorily-prescribed period under section 1382 is 60 days.  As such, the statute requires dismissal if trial is not commenced within 60 days of declaration of mistrial, unless good cause is found or the defendant consents to waive time, in which case he may be brought to trial on or within 10 days after the date of his consent.  (§ 1382, subd. (a)(2)(B); see also *People v. Lewis* (2001) 25 Cal.4th 610, 628-629.)  Thus, "[t]he 10-day period does not begin to run until the defendant announces ready for trial on the date to which the trial was continued, or on

---

tried again following a mistrial, . . . within 60 days after the mistrial has been declared . . . . However, an action shall not be dismissed under this paragraph if either of the following circumstances exists:

  "(A) The defendant enters a general waiver of the 60-day trial requirement.  . . .

  "(B) The defendant requests or consents to the setting of a trial date beyond the 60-day period. In the absence of an express general time waiver from the defendant, or upon the withdrawal of a general time waiver, the court shall set a trial date. Whenever a case is set for trial beyond the 60-day period by request or consent, expressed or implied, of the defendant without a general waiver, the defendant shall be brought to trial on the date set for trial or within 10 days thereafter.

"Whenever a case is set for trial after a defendant enters either a general waiver as to the 60-day trial requirement or requests or consents, expressed or implied, to the setting of a trial date beyond the 60-day period pursuant to this paragraph, the court may not grant a motion of the defendant to vacate the date set for trial and to set an earlier trial date unless all parties are properly noticed and the court finds good cause for granting that motion."

a later date to which the defendant impliedly or expressly consented if the case was again continued." (*Medina v. Superior Court* (2000) 79 Cal.App.4th 1280, 1286.)

"A waiver of statutory speedy trial rights occurs when defense counsel consents to or requests a delay in the proceedings. Consent may be express or implied (§ 1382, subd. (a)(2)(B), (3)(B)), and is inferred from silence. '[F]ailure of defendant or his counsel to make timely objection to a postponement constitutes implied consent to the postponement.' [Citations]; see also Judicial Council of Cal., Seventeenth Biennial Report (1959) p. 31; Note, *Selected 1959 Code Legislation* (1959) 34 State Bar J. 583, 717–718 [§ 1382, as amended in 1959, was intended to codify the rule that 'a postponement is attributable to defendant not only when he requests a continuance, but also when he . . . consents, either expressly or impliedly, to a continuance requested by the prosecution. Implied consent is the failure to object'].)" (*Barsamyan, supra,* 44 Cal.4th at pp. 969-970; see also *People v. Wilson* (1963) 60 Cal.2d 139, 146 [consent to waiver of time is presumed for purposes of section 1382 "unless the defendant *both* objects to the date set *and* thereafter files a timely motion to dismiss"].)

"Defense counsel, as part of his or her control of the procedural aspects of a trial, ordinarily has authority to waive the statutory speedy trial rights of his or her client, even over the client's objection, as long as counsel is acting competently in the client's best interest. [Citations.] This is because statutory speedy trial rights are not among those rights that are considered so fundamental that they are ' "beyond counsel's primary control.' [Citations.]." (*Barsamyan, supra,* 44 Cal.4th at p. 969.) Finally, whether the defendant or his counsel has waived his right to a speedy trial is an issue of fact left to the trial court. As such, unless the facts establish the existence or nonexistence of waiver as a matter of law, the reviewing court must affirm the trial court's determination. (*In re Bishop* (1962) 201 Cal.App.2d 604, 609.)

Returning to the issue at hand, we accept, based on the record and law set forth above, the trial court's preliminary factual findings that: (1) defendant did not waive

15

time at the December 6, 2010 hearing, when the trial court declared a mistrial;[11] (2) he thereafter impliedly consented to the time waiver entered by his new counsel, Maureen Kildee, on December 16, 2010 ("Mr. Aslam is willing to waive time right now") and; (3) upon pulling this time waiver on January 14, 2011, he impliedly consented to the trial court's order to set a March 7, 2011 trial date, a date within the 60-day period that began to run on January 14, 2011, by failing to raise an objection.[12] (*Barsamyan, supra,* 44 Cal.4th at pp. 969-970; *Townsend v. Superior Court* (1975) 15 Cal.3d 774, 780.)

Next, with respect to the ruling granting defense counsel Donald Foley's March 7, 2011 request for continuance, we agree with the trial court that the requisite good cause for delay was shown. As the trial court recognized, the request was not based solely on defense counsel's need to focus on other cases (cf. *People v. Johnson, supra,* 26 Cal.3d at pp. 566-569) or, as defendant claims, caused by or indicative of counsel's incompetence or ineffectiveness. Rather, the request was based on Foley's understandable need for more time to prepare for trial given that he was not appointed counsel until February 10,

---

[11] Defendant makes much of the fact that, on December 8, 2010, the trial court erroneously told his counsel, Gary Sherrer, that he had entered a general time waiver on December 6. Defendant condemns the prosecution for allegedly standing silent during this hearing, despite knowing the trial court was misstating the record from December 6. However, given the trial court's subsequent finding when ruling on his motion to dismiss that he did not enter a general time waiver on that date (but nonetheless impliedly consented to waive time at the January 14, 2011, hearing), we fail to grasp the significance of this purported error. In particular, while defendant suggests that Kildee, who was appointed December 16, 2011, would not have "continue[d] to" waive time if she had realized defendant had not initially entered the general time waiver, his suggestion is mere speculation, particularly in light of her recent entry into the case. Moreover, his suggestion that Kildee was somehow incompetent based on her inability to go to trial "within 60 days of his mistrial by February 4, 2011," despite her December 16th appointment, is simply not realistic or supported by the record. (See *People v. Simpson* (1939) 31 Cal.App.2d 267, 272 ["To deny reasonable time for counsel to prepare for trial is to strip the right of representation of much of its value"].)

[12] Defendant insists the trial court "ignor[ed] the statutory deadline of February 4, 2011" when it set trial for March 7. In doing so, defendant erroneously ignores his own implied consent to waive time on December 16, 2010, resulting from his silence in the face of his counsel's express statement that he was "willing to waive time right now."

16

2011, following defendant's *Marsden* motion to replace Kildee. It is well-established that delaying trial for a defendant's benefit or due to a defendant's conduct constitutes good cause, even where the request for continuance was made by counsel over defendant's objection.[13] (*Townsend v. Superior Court, supra,* 15 Cal.3d at p. 781 [defense counsel's request for continuance ordinarily constitutes good cause for delay for purposes of § 1382 unless the " 'representation by counsel is so ineffective that it can be described as a "farce and a sham" ' "].) As such, we find no grounds for disturbing the trial court's ruling. (*People v. Johnson*, *supra*, 26 Cal.3d at p. 570 [" 'What constitutes good cause for the delay of a criminal trial is a matter that lies within the discretion of the trial court' "].)

In so finding, we reject defendant's attempt to place blame for the delay in his case on the trial court, the court reporter or the prosecution. (*People v. Lomax, supra,* 49 Cal.4th at p. 554 [" '[D]elay attributable to the fault of the prosecution, on the other hand, does not constitute good cause' for a continuance' "].) Specifically, defendant argues that the State's failure to ensure timely preparation of the transcripts from his first trial deprived him of his speedy trial rights. (See *People v. Hajjaj* (2010) 50 Cal.4th 1184, 1201 ["[I]t is within the State's power and authority, and it is indeed its obligation, to ensure that when a criminal case ends in mistrial, transcripts from that trial are prepared in a timely manner so the defendant can realistically assert his right to a speedy trial"].) According to defendant, the State's purported failure to discharge its mandatory duty to ensure prompt preparation of the transcripts enabled R.L., a crucial witness and the only percipient witness to his alleged sexual offenses, to disappear before testifying, which, in

---

[13]    As the record reflects, Kildee's request to withdraw as counsel based on a breakdown of the attorney-client relationship was granted on February 9, 2011, the same day defendant stated his intent to make a *Marsden* motion. In granting Kildee's request, the trial court warned defendant: "you understand this is going to affect your time waiver dramatically, right?" Further, when defendant remained insistent that trial begin March 7, 2011, the trial court added: "You want someone to represent you when they are not ready? We're probably not going to permit that."

17

turn, violated his right of confrontation. We find defendant's argument unpersuasive for several reasons.

First, defendant ignores his own role in the delay of trial beyond the statutory period. As the trial court found, all continuances up to that point had been made at the request of the defense, and were caused by defendant's repeated requests for new counsel. (*Eshaghian v. Mun. Court* (1985) 168 Cal.App.3d 1070, 1079 [good cause for delay exists where "[p]rimarily the continuance was made necessary to comply with the request of petitioner to get new counsel"]; *People v. Lomax, supra,* 49 Cal.4th at p. 556 [affirming a good cause finding in a capital murder case where, although defendant claimed his speedy trial rights were violated, "defendant himself is to blame for much of the delay in the proceedings . . . [in that] he repeatedly invoked his right of self-representation in attempts to manipulate the court into appointing a different attorney"].) The prosecutor, on the other hand, indicated a willingness to proceed to trial on the March 7 date. Thus, while it may be true that "exceptional circumstances such as ineffective assistance of counsel could render inoperative the waiver of speedy trial rights by counsel over the client's objection" (*Barsamyan, supra*, 44 Cal.4th p. 981), this circumstance does not exist here.

Further, with respect to preparation of the transcripts from the first trial, we accept that this delay was less than ideal.[14] However, contrary to defendant's suggestion, the need to review the transcripts was not the only reason his counsel was not ready for trial by March 7, 2011. Rather, Donald Foley, who, as mentioned above, was not appointed

---

[14] We note the trial court's clarification on the record that the delay in preparing the trial transcripts was not due to any dilatory conduct by the court reporter, but rather to the exceptional circumstance that she was under several appellate court orders to prepare transcripts in other matters. (Compare *People v. Johnson*, *supra*, 26 Cal.3d at pp. 571-572 ["The state cannot reasonably provide against all contingencies which may create a calendar conflict for public defenders and compel postponement of some of their cases. On the other hand, routine assignment of heavy caseloads to understaffed offices, when such practice foreseeably will result in the delay of trials beyond the 60-day period without defendant's consent, can and must be avoided"].) There is no evidence, moreover, that the court reporter's delay was part of a chronic failure of this particular court to ensure prompt and competent administration of justice.

defense counsel until mid-February, advised the trial court on March 3 and again on March 7 that, even aside from the trial transcripts, he needed more time to, among other things, review the three boxes of evidence from the first trial before he could proceed with trial.[15] As Foley explained: "[T]his kind of a case that is stretched out for five years, I'm not near the end of it." As such, the record reflects that, even if the transcripts had been completed by March 7, defense counsel would not have been ready for trial.

Finally, we briefly discuss defendant's claim of prejudice from the delay in his trial – to wit, R.L.'s absence, an issue discussed in much greater detail in connection with defendant's Confrontation Clause claims. Simply put, as the trial court found, the record does not support his claim. First, despite what defendant states (mostly without the requisite citation to the record), there is no indication the prosecution acted for tactical reasons to delay trial based upon secret knowledge that R.L. intended to leave town.[16] Moreover, as the charges themselves reflect, it was defendant who, before trial, engaged in a lengthy course of conduct that included issuing threats of violence to discourage R.L. from appearing. There is also evidence of other factors, wholly unrelated to the scheduling of defendant's trial, that led to R.L.'s departure, not the least of which being her pimp's or her own wish to leave. And, finally, even if we were to somehow blame the court or prosecutor for R.L.'s absence, there remains no showing on this record that her testimony would have helped defendant achieve a more favorable result. (*People v. Salcido* (1968) 263 Cal.App.2d 1, 69 [speculation regarding how a witness would have

---

[15] On appeal, defendant disputes Foley's representation that there were three boxes containing 7,000 pages of evidence from his first trial. However, there is no indication that defendant raised this factual dispute in the trial court, where it could have been properly resolved. Moreover, even were we to consider this issue for the first time on appeal, defendant has directed us to nothing in the record to undermine Foley's statement.

[16] The prosecution's efforts to secure R.L.'s appearance at trial are discussed in much greater detail below. (pp. 22-23, *post*.) We note here, however, that the California State Bar rejected defendant's complaint alleging the prosecutor engaged in prosecutorial misconduct in this case by, among other things, lying or otherwise misrepresenting or concealing information regarding his contacts with R.L.

testified at an earlier trial does not prove defendant would have achieved a more favorable result].) Accordingly, defendant's request for dismissal was properly denied by the trial court, and his petition for writ of habeas corpus, based on the same state and federal right to a speedy trial, is herein summarily denied. (*People v. Johnson, supra*, 26 Cal.3d at p. 575 ["once a defendant has been tried and convicted, the state Constitution in article VI, section 13, forbids reversal for nonprejudicial error"].)

As our high court has explained under comparable circumstances: "When defendant refused to waive time . . . despite his attorney's plea that he was 'absolutely' not ready to proceed and needed more time to prepare the case for trial, the situation presented a classic confrontation between defendant's statutory and constitutional rights to a speedy trial and his Sixth Amendment right to competent and adequately prepared counsel. [Citations.] If counsel seeks reasonable time to prepare a defendant's case, and the delay is for defendant's benefit, a continuance over the defendant's objection is justified. [Citation.] Likewise here, the trial court did not abuse its discretion in granting a continuance when counsel announced he was not ready to try a death penalty case. Although defendant now argues otherwise, a continuance to permit further investigation and preparation was clearly in his best interest. 'Although a criminal defendant may not be deprived of a speedy trial because the prosecution—or the defense—is lazy or indifferent, or because the prosecution seeks to harass the defendant rather than bring him fairly to justice, a criminal defendant may not juggle his constitutional rights in an attempt to evade prosecution.' " (*People v. Lomax, supra*, 49 Cal.4th at pp. 556-557.)

## II. Defendant's Constitutional Right to Confrontation.

Defendant's second contention is that the trial court violated his state and federal constitutional right to confront adverse witnesses, resulting in prejudice, by admitting into evidence R.L.'s preliminary hearing testimony and her statements to Officer Saleda regarding the May 2006 incident (lewd act, count one) and the April 30, 2010 incident (unlawful sexual intercourse, count five). (U.S. Const., 6th Amend.; Cal. Const., art. 1, § 15.) The principles governing review of this issue are not in dispute.

20

Because a criminal defendant has a constitutional right under both state and federal law to confront witnesses testifying against him, "[t]estimonial statements of witnesses absent from trial [are] admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." (*People v. Wilson* (2005) 36 Cal.4th 309, 340, quoting *Crawford v. Washington* (2004) 541 U.S. 36, 59.) In California, this principle is codified in Evidence Code section 1291 (section 1291).[17] "When the requirements of Evidence Code section 1291 are met, 'admitting former testimony in evidence does not violate a defendant's right of confrontation under the federal Constitution. [Citations.]' " (*People v. Wilson*, *supra*, 36 Cal.4th at p. 340, quoting *People v. Mayfield* (1997) 14 Cal.4th 668, 742.)

In applying section 1291, the following legal definitions are relevant. "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." (*Davis v. Washington* (2006) 547 U.S. 813, 822, fn. omitted; see also *People v. Byron* (2009) 170 Cal.App.4th 657, 668.) A witness is "unavailable" if he or she is "[a]bsent from the hearing and the proponent of his or her statement has exercised reasonable diligence but has been unable to procure his or her attendance by the court's process." (Evid. Code, § 240, subd. (a)(5).) And "reasonable diligence," while incapable of "'mechanical definition' " (*People v. Sanders* (1995) 11 Cal.4th 475, 523), connotes "persevering application, untiring efforts in good earnest, efforts of substantial character." (*People v. Friend* (2009) 47 Cal.4th 1, 68 (internal quote marks omitted);

---

[17] Evidence Code section 1291 provides in relevant part: "Evidence of former testimony is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and: [¶] . . . [¶] (2) The party against whom the former testimony is offered was a party to the action or proceeding in which the testimony was given and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing." (Evid. Code, § 1291, subd. (a).)

*People v. Sanders, supra,* 11 Cal.4th at p. 523 [due diligence to secure the presence of a witness hinges on the facts of each individual case].)

Finally, we keep in mind the proponent of the absent witness's testimony bears the burden of proving unavailability by a preponderance of the evidence.  (*People v. Winslow* (2004) 123 Cal.App.4th 464, 471.)  And, on appeal, we defer to the trial court's determination of historical facts regarding the prosecution's efforts to procure the absent witness's attendance at trial, while independently reviewing whether those efforts constitute due diligence for purposes of Evidence Code sections 1291 and 240.  (*People v. Bunyard* (2009) 45 Cal.4th 836, 851.)

### A.      Admission of R.L.'s Preliminary Hearing Testimony.

Returning to the facts at hand, we first consider defendant's challenge to the admission of R.L.'s preliminary hearing testimony based upon the trial court's purported errors in finding that:  (1) R.L. was unavailable to testify at trial, and (2) defense counsel had an adequate opportunity to cross-examine her at the preliminary hearing regarding the May 2006 incident.  According to defendant, if we affirm the trial court's finding that R.L. was unavailable, he does not further challenge the trial court's admission of her preliminary hearing testimony regarding the 2010 incidents, but only regarding the May 2006 incident.

### 2**.      R.L.'s Availability to Testify.**

In ruling to admit into evidence R.L.'s preliminary hearing testimony from June 2010, the trial court found the following efforts by the prosecution to secure her presence at trial sufficient to establish reasonable diligence.  As recounted in the prosecution's offer of proof (which the court accepted without objection), R.L. was arrested on January 4, 2011 and held on a probation warrant for less than a week in a juvenile facility.  R.L.'s arrest followed the prosecutor's call to police with information regarding her whereabouts that he received from Mother.  Further, during her detention, the prosecution arranged for R.L. to be personally served to appear in court on February 2, 2011.  The prosecutor also appeared in person in juvenile court to ask for help to ensure R.L. would cooperate with this case despite her previous failure to appear

on a scheduled date.  R.L.'s attorney represented to the juvenile court that she would meet with prosecutors, and the juvenile court thereafter ordered her to remain in custody for a few days.

R.L. thereafter complied with the subpoena and, once released from custody, attended a meeting with the prosecution team on February 2, 2011, during which she was introduced to Adele Rodarte, a victim witness advocate, and ordered to return to court for trial on March 3, 2011.  However, despite several phone calls from the prosecution after the February 2 meeting, including one in which she indicated a willingness to cooperate, R.L. did not comply with the subpoena to appear on March 3rd.[18]  A bench warrant was thus issued for R.L.

The March 3, 2011 trial date was ultimately continued after defendant fired his attorney, and the next court date was set for April 28, 2011.  In anticipation of this hearing, the prosecutor attempted several more times to make contact with R.L.  Among other things, the prosecutor tried a number of different phone numbers linked to R.L., and kept in close contact with Officer Saleda, who had been searching for R.L. at hospitals, motels, and through various internet sites used in the past by her pimps to solicit customers.  None of these leads ultimately panned out.  In addition, Mother called the prosecutor several times to report having seen R.L., but each time police went to the reported location they could not find R.L.  Then, about a week before the hearing on admission of R.L.'s preliminary hearing testimony, Mother called the prosecutor to report that R.L. had called her from an unidentified location in West Virginia, where, according to Mother, her pimp was holding her without access to money or her telephone.  The prosecutor counseled Mother to tell R.L. that, if she called the police, they would arrange to fly her back to Oakland, but R.L. did not do so.[19]

---

[18]  Mother, who did appear, stated that R.L. knew she was supposed to be there, but could not be controlled.

[19]  The prosecution offered into evidence a six-page document containing a chronological record of the efforts of its investigator, Inspector Williams, through January 18, 2011 to make R.L. available to testify.  This document was admitted into

23

After making this offer of proof, the prosecutor made one additional point regarding R.L.'s unavailability: "[W]hen we've had her in custody, something happens. Something on the defense side. Whether it's a continuance or whether it is firing an attorney or whatever it is. Something happens. And we want to bring her to court, but we – the proceedings are always continued under those circumstances."

After hearing this evidence, the trial court found based on a totality of the circumstances that "the People [have] done everything they could possibly be expected to do to get [R.L.] into this courtroom," despite it being a "great understatement" to say she "doesn't want to be here." In particular, the court noted the prosecution and its representatives "have gone out to her house, they've talked to her mother, they've gone to places where she normally either resides or frequents, they've talked to colleagues, they have secured warrants for her arrest, and they have made innumerable telephone calls to all of the various people . . . , and including, as I've stated, personal visits to all these locales to try to find her and bring her in here. [¶] And at least the current status as of several days ago, this week, apparently not only have those efforts failed, but [R.L.] has now removed herself some 3,000 miles from the court to the State of West Virginia. This according to her mother. And is not planning to come to court [¶] Now, whether or not she is held there in some form of duress by a pimp, or otherwise, I don't know and can't rule. But, it appears that she has absented herself from this jurisdiction, gotten herself 3,000 miles away and the district attorney has no phone numbers, no addresses, that they can use to even try to effect out-of-state service." Finally, the trial court added: "[I]t would appear there's some merit [to the prosecutor's suggestion] . . . that the actions of prior counsel . . . have been to frustrate, at least in part, to frustrate the efforts of the district attorney to proceed to trial at a time and in a place when [R.L.] was available as a witness."

Having considered this record, in totality, regarding the prosecution's diligence in attempting to secure R.L.'s appearance, we affirm the trial court's unavailability finding.

---

evidence as the People's Exhibit 9. Defense counsel declined to cross-examine Inspector Williams regarding the content of this exhibit.

24

Without wholly rehashing the above-described efforts, it is clear the prosecution made repeated and consistent efforts to keep tabs on R.L., working closely with Mother, the police and even a victim advocate associated with the juvenile court to stay in direct or phone contact with the minor. Then, after losing contact with R.L., the prosecutor, again with police assistance, took further efforts to search hospitals, motels and internet sites to try to locate her. Finally, upon learning that R.L. was at an unknown location with her pimp in West Virginia, the prosecution offered, through Mother, to help her return to Oakland. Particularly in light of the many factors working against the prosecution during this time period, including defendant's threat-making, the apparent desire of R.L.'s pimp to keep her in West Virginia, and R.L.'s own recalcitrance, we agree with the trial court that the reasonable diligence standard was met.

As defendant correctly notes, "[t]he obligation to use reasonable means to procure the presence of the witness has two aspects. The more obvious is the duty to act with due diligence in attempting to make an absent witness present. Less obvious, perhaps, but no less important 'is the duty to use reasonable means to prevent a present witness from becoming absent.' [Citation.] If the prosecution fails in this latter duty, it does not satisfy the requirement of due diligence. (*Ibid*.)" (*People v. Louis* (1986) 42 Cal.3d 969, 991.) However, here, as stated above, the prosecution complied with these dual requirements by, among other things, working with R.L., the police and the juvenile system to encourage her cooperation before her disappearance, and then working with the police and Mother to locate her and assist her return home after her disappearance. While defendant insists there were "obvious things the prosecutor could have done, but did not do, to procure R.L.'s attendance," we decline to base our decision on a hindsight-analysis as to other actions that may have worked. "An appellate court will not reverse a trial court's determination simply because the defendant can conceive of some further step or avenue left unexplored by the prosecution." (*People v. Diaz* (2002) 95 Cal.App.4th 695, 706 [adding that courts should not be persuaded by the suggestions of "Monday morning quarterbacks" as to what more should have been done].)

Finally, in affirming the due diligence finding, we cannot ignore the indications in the record, referred to by the trial court, that previous defense counsel made certain tactical decisions, including filing at least one request for continuance, based to some degree on his preference that R.L. *not* appear for trial. (See *People v. Bunyard, supra,* 45 Cal.4th at p. 851 [reviewing court must defer to the trial court's findings of historical fact when considering due diligence].) This factor, which distinguishes our case from the authority relied upon by defendant,[20] is in addition to the already substantial record of defendant's efforts leading up to the first trial to prevent R.L. from testifying, which included, among other things, paying large sums of money to have her leave the area and threatening violence to R.L. and her family in the event she were to testify. Regardless of whether this conduct by defendant and his counsel to prevent R.L.'s appearance supports a legal finding that he forfeited his Sixth Amendment right of confrontation, an issue not before us,[21] it nonetheless factors into our inquiry. (See *People v. Sanders, supra,* 11

---

[20]    In *People v. Louis* (1986) 42 Cal.3d 969, 991, for example, the high court reversed a finding of due diligence where, among other things, the prosecutor admittedly failed to exercise "virtually any effort to prevent [the witness] from becoming absent" (with the exception of serving him with a subpoena to appear) despite the witness's "indisputable unreliability" (*id*. at p. 992, fn. 6). In doing so, the high court noted that the prosecutor's failure to take even minimal action to secure the witness's appearance "suggests indifference" and may have been "because he hoped [the witness] would disappear, since, as the [trial] court recognized, 'he would not look as good in person as he does in reading out of the transcript. . . .' " (*Id*. at p. 993 & fn. 7.) There are no such facts of prosecutorial indifference in this case. To the contrary, the facts set forth above demonstrate the prosecution undertook a sustained, albeit, unsuccessful effort to keep track of R.L. and secure her attendance at trial, even offering to fly her back from West Virginia if she would contact them with information regarding her location. (Cf. *People v. Blackwood* (1983) 138 Cal.App.3d 939, 947 [holding that the prosecution's efforts did not constitute due diligence where, *despite knowing the witness's out-of-state location*, the prosecution failed to utilize interstate procedure to obtain the witness's attendance].) On the other hand, there are many facts indicating *defendant*, like the prosecutor in *People v. Louis*, wished R.L. "would disappear."

[21]    See *People v. Banos* (2009) 178 Cal.App.4th 483, 501 ["forfeiture by wrongdoing is implicated not only when the defendant intends to prevent a witness from testifying in court but also when the defendant's efforts were designed to dissuade the witness from cooperating with the police or other law enforcement authorities"]; see also *Steele v.*

Cal.4th at p. 523 [due diligence to secure the presence of a witness must be determined in light of the facts of each case].)  Accordingly, on this record, we stand by the trial court's finding with respect to R.L.'s unavailability to testify at trial.

## 2. Opportunity to Cross-Examine R.L. at the Preliminary Hearing.

Continuing to the second prong of our inquiry, we must now decide whether defense counsel had the right and opportunity to cross-examine R.L. at the preliminary hearing with an interest and motive similar to that which he had at trial.  (§ 1291, subd. (a)(2); see also *People v. Valencia* (2008) 43 Cal.4th 268, 292; *People v. Samayoa* (1997) 15 Cal.4th 795, 850 ["motives need not be identical, only 'similar' "].)  The following facts are relevant.

At the hearing on whether to admit R.L.'s preliminary hearing testimony, the prosecutor made an offer of proof, which the trial court accepted without objection, regarding defense counsel's right and opportunity to cross-examine R.L.[22]  The prosecutor, who was present at the preliminary hearing, witnessed prior defense counsel Gary Sherrer state under oath in open court that he was fully aware of the significant risk R.L. would not appear at trial, and thus of the need to cross-examine her at the preliminary hearing so as to create an adequate record of her testimony for possible use at trial.  Specifically, as recounted by the prosecutor, Sherrer stated during motion hearing at defendant's first trial that "he prepared for cross-examination with [R.L.] as if she would not be at the trial because he knew it was a significant possibility.  And he said he was prepared to cross-examine her because he knew that a transcript [of her preliminary

---

*Taylor* (6th Cir. 1982) 684 F.2d 1193, 1202 ["A defendant cannot prefer the law's preference [for live testimony over hearsay] and profit from it . . . while repudiating that preference by creating the condition that prevents it"].)

[22]     In doing so, the trial court stated that, if "there is any further dispute on [the prosecutor's offer of proof regarding Sherrer's representations], perhaps on another level, the transcript of that testimony can be reviewed."  Defense counsel thereafter raised no objection.

hearing testimony] could be used at trial." Defense counsel raised no objection to this offer of proof by the prosecution.[23]

The trial court found based upon this record that the questions Sherrer did and did not ask R.L. during the preliminary hearing were "his tactical decisions . . . as an experienced attorney." In addition, the trial court conducted its own review of the preliminary hearing transcript and found that "it appears to me to be a thorough in-depth examination." With that, the court admitted into evidence R.L.'s testimony from June 29, 2010.

Having also reviewed the relevant record, we see no grounds for reversing the trial court's decision. While defendant is correct that R.L. was not cross-examined with respect to the May 2006 incident, we concur with the trial court that this lack of questioning is more likely attributable to legal strategy than to any procedural obstacle imposed upon defense counsel by the court or prosecution. (Cf. *People v. Louis, supra*, 42 Cal.3d at p. 990 [noting that counsel's efforts to cross-examine the witness in a manner similar to the way he would have at trial had been "frustrated to a certain extent by restrictions imposed by the magistrate"].)

In addition, we reject defendant's argument that his counsel necessarily lacked the opportunity at the June 2010 preliminary hearing to cross-examine R.L. with a similar motive regarding the May 2006 incident (count one) because he lacked the right to do so, given that the preliminary hearing was being held with respect to the 2010 incidents (counts two through six) rather than to the May 2006 incident. (See *People v. Eid* (1994) 31 Cal.App.4th 114, 129 ["[Cross-]examination shall not be used for purposes of discovery"].) The record indisputably reflects that the prosecution questioned R.L. extensively about the May 2006 incident, that defense counsel Sherrer thereafter acknowledged on the record his understanding of the significant likelihood this testimony would be offered at trial in R.L.'s absence, and that defense counsel nonetheless declined, for apparently tactical (yet unexplained) reasons, to cross-examine her about the

---

[23]     Sherrer was later excused as defendant's counsel.

May 2006 incident.[24]  This, we conclude, suffices to establish the right and opportunity to cross-examine a witness with a similar motive for purposes of section 1291, subdivision (a)(2).  (See *People v. Wilson* (2005) 36 Cal.4th 309, 343 ["[the Confrontation Clause] commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination. The Clause thus reflects a judgment, not only about the desirability of reliable evidence . . . , but about how reliability can best be determined"].)

Moreover, even if there had been evidence that defense counsel was somehow hindered in questioning R.L. regarding the May 2006 lewd act, we would nonetheless find no grounds for reversal on this record.  Quite simply, any such error cannot be deemed prejudicial to defendant given the overwhelming evidence of his guilt on count one.  To name but a few examples, strong DNA evidence linked both defendant's sperm and R.L.'s epithelial cell to the used condom found at the crime scene, and defendant, the only person present with R.L. in the hotel room when police arrived, was found attempting to conceal his underwear in the toilet tank.  Finally, the fact of R.L.'s age (13) on the day in question was conclusively established without reference to her preliminary hearing testimony by her birth certificate obtained by police.  On this record alone, the jury had a valid basis for finding defendant guilty of committing a the lewd act against R.L., a child under the age of 14, beyond a reasonable doubt, rendering any error in admitting her preliminary hearing testimony harmless.  (See *Chapman v. California* (1967) 386 U.S. 18, 23-24.)

Finally, with respect to R.L.'s testimony regarding the 2010 incidents of unlawful sexual intercourse and witness dissuasion, we need not analyze further whether it was

---

[24]    Defense counsel's acknowledgement on the record of the risk R.L. would not appear for trial and thus of the possibility her preliminary hearing testimony would be used at trial belies defendant's contention on appeal that his counsel had no notice of the need to prepare for and conduct cross-examination regarding the May 2006 incident. Indeed, defense counsel heard the prosecutor's questions regarding the May 2006 incident during the preliminary hearing, but raised no objection on due process or any other grounds despite having the opportunity to do so.

properly admitted given our earlier conclusion regarding R.L.'s unavailability. In defendant's own words, "[he] does not contend that the court erred in admitting R.L.'s preliminary hearing testimony about the 2010 incidents if she was unavailable at trial." As such, we continue to the next issue.

### B.      Admission of R.L.'s Statements to Police.

Next, we consider the trial court's admission into evidence of statements R.L. made to Officer Saleda during questioning on May 3, 2006, the same day she was found with defendant in the Oakland motel room, and again on May 26, 2010, after Officer Saleda ran into R.L. while working as part of the child exploitation unit. The trial court admitted R.L.'s May 3, 2006 statements to Officer Saleda that she had just engaged in sexual intercourse with defendant in the motel room in exchange for money under the "fresh complaint" doctrine.[25] The trial court likewise admitted R.L.'s May 26, 2010 statements to Officer Saleda that she and defendant engaged in oral sex and sexual intercourse on April 30, 2010 at a Motel 6 in Oakland in exchange for money as a fresh complaint. Initially, the trial court added a limiting instruction that R.L.'s statements

---

[25]      The "fresh complaint" doctrine is as follows: "[*U*]*nder principles generally applicable to the determination of evidentiary relevance and admissibility*, proof of an extrajudicial complaint, made by the victim of a sexual offense, disclosing the alleged assault, may be admissible for a limited, nonhearsay purpose ─ namely, to establish the fact of, and the circumstances surrounding, the victim's disclosure of the assault to others--whenever the fact that the disclosure was made and the circumstances under which it was made are relevant to the trier of fact's determination as to whether the offense occurred. Under such generally applicable evidentiary rules, the timing of a complaint (e.g., whether it was made promptly after the incident or, rather, at a later date) and the circumstances under which it was made (e.g., whether it was volunteered spontaneously or, instead, was made only in response to the inquiry of another person) are not necessarily determinative of the admissibility of evidence of the complaint. Thus, the 'freshness' of a complaint, and the 'volunteered' nature of the complaint, should not be viewed as essential prerequisites to the admissibility of such evidence." (*People v. Brown* (1994) 8 Cal.4th 746, 749-750.) However, "the testimony [should be] limited to the timing of [the] complaint and the circumstances under which it was made, omitting the content of the statements and specifically any description of the [sexual act] itself." (*Id*. at p. 764.) There is no contention here that R.L.'s testimony went beyond these limits.

could only be considered for the nonhearsay purpose of explaining Officer Saleda's subsequent investigative actions. However, the trial court later withdrew this limiting instruction, advising the jury that it would "now allow such testimony to be received without any such limitation."

Defendant contends on appeal the rulings to admit R.L.'s statements violated his rights under the Confrontation Clause. However, recognizing no timely objection based on the Confrontation Clause was raised below, resulting in forfeiture (*People v. Tafoya* (2007) 42 Cal.4th 147, 166), defendant now contends his counsel's failure to object amounted to ineffective assistance in violation of his Sixth Amendment rights.

We reject defendant's challenge to the court's admission of this evidence without delving into the substance of his legal arguments because, quite simply, it is unnecessary on this record.[26] R.L.'s statements to Officer Saleda on both May 3, 2006, and May 26, 2010 do little more than confirm and describe defendant's commission of the sexual offenses charged in counts one and five. As such, her statements are merely cumulative to other properly admitted and equally probative evidence, such that, even if we were to find error in their admission, we would nonetheless conclude such error was harmless beyond a reasonable doubt. (*People v. Livingston* (2012) 53 Cal.4th 1145, 1159 [" 'Confrontation clause violations are subject to federal harmless-error analysis under *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L. Ed. 2d 705, 87 S. Ct. 824].' [Citation.] We ask whether it is clear beyond a reasonable doubt that a rational jury would have reached the same verdict absent the error"].) Specifically, as we have just explained in detail above, R.L.'s statements regarding the May 2006 incident were not only properly admitted in the form of her preliminary hearing testimony, they were also substantiated by other overwhelming evidence of defendant's guilt in committing a lewd act, including DNA evidence. (See p. 29, *ante*.) Similarly, R.L.'s subsequent statements

---

[26] We simply note for the record that counsel's failure to object to admission of certain evidence is an inherently tactical decision that "will rarely establish ineffective assistance." (*People v. Chatman* (2006) 38 Cal.4th 344, 384; see also *People v. Johnson* (1993) 6 Cal.4th 1, 35.)

31

to Officer Saleda that, as a minor, she engaged in sexual intercourse with defendant on April 30, 2010, in exchange for money were wholly consistent with her properly admitted preliminary hearing testimony regarding their evening together at the Oakland Motel 6, and were further supported by other documentary and testimonial evidence in the record, including Officer Saleda's testimony and motel records identifying both defendant and R.L. as room occupants for a short time on that evening.

Accordingly, given the cumulative nature of the challenged evidence and the resulting lack of prejudice in its admission, even assuming R.L.'s statements to Officer Saleda were testimonial for purposes of the confrontation clause, there remains no basis for reversal. (*People v. Riccardi* (2012) 54 Cal.4th 758, 829 [admission of evidence cumulative to properly admitted evidence does not prejudice the defendant]; *People v. Livingston, supra,* 53 Cal.4th at p. 1159 [same]. See also *Davis v. Washington, supra*, 547 U.S. at p. 822 ["Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency"].)

## III.    Failure to Instruct the Jury on Accomplice Testimony.

Defendant next argues the trial court committed reversible error by failing to instruct the jury sua sponte that testimony of an accomplice tending to incriminate a defendant should be viewed with caution and that the prosecution has the burden to produce evidence of a certain quality to corroborate accomplice testimony. (*People v. Guiuan* (1998) 18 Cal.4th 558, 564; § 1111.) For reasons set forth below, we disagree.

An accomplice is one "who is liable to the prosecution for the identical offense charged against the defendant on trial in the cause to which the testimony of the accomplice is given." (§ 1111.) Here, the "identical offense" is dissuading a witness, which is committed when the defendant "[k]nowingly and maliciously prevents or dissuades any witness or victim from attending or giving testimony at any trial, proceeding, or inquiry authorized by law." (§ 136.1, subd. (a)(1).) Further, as defendant states, "[w]hen an accomplice is called as a witness by the prosecution, the court must instruct the jurors sua sponte to distrust his testimony." (*People v. Guiuan, supra,* 18

32

Cal.4th at p. 564; CALCRIM No. 334.) The court must also instruct that "[n]o conviction can be had upon the testimony of an accomplice unless such testimony is corroborated by other evidence tending to connect the defendant with the commission of the offense." (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 103; CALCRIM Nos. 334-335.)[27] Whether a witness ultimately qualifies as an accomplice for the charged offense is a question of fact for the jury. (*People v. Williams* (2008) 43 Cal.4th 584, 636.)

In this case, defendant contends that "Mother knew of [his] unlawful intent to dissuade R.L. from testifying, and acted with the intent or purpose of facilitating or encouraging her not to testify, thereby aiding and abetting him in dissuading R.L. from testifying, making her an accomplice to that offense." As such, defendant contends the trial court had a duty to instruct the jury that Mother's testimony should be distrusted and that, without evidence corroborating her testimony, he could not be convicted of any charged offense based on it. Finally, defendant continues, the trial court's failure to give these instructions was prejudicial given the lack of the requisite corroborating evidence, which, in turn, requires reversal.

In making this argument, defendant recognizes the statutory presumption that arises where there is "evidence that the defendant was a family member who interceded in an effort to protect the witness or victim shall create a presumption that the act was without malice." (§ 136.1, subd. (a)(3).) Defendant insists, however, that the jury in this case was entitled to decide whether this presumption applied or was successfully rebutted by evidence that Mother "acted in her own interest" to prevent R.L. from testifying as "a means for her to keep getting money from [defendant]." Moreover, defendant argues,

---

[27] "The corroborating evidence may be circumstantial or slight and entitled to little consideration when standing alone, and it must tend to implicate the defendant by relating to an act that is an element of the crime. The corroborating evidence need not by itself establish every element of the crime, but it must, without aid from the accomplice's testimony, tend to connect the defendant with the crime. [Citation.]" (*People v. McDermott* (2002) 28 Cal.4th 946, 985-986; see also *People v. Sanders, supra,* 11 Cal.4th at pp. 534-535.)

33

"[b]ecause there was insufficient evidence to corroborate Mother's testimony concerning the alleged dissuasion of R.L. on March 30 and 31 [when the alleged dissuasion occurred], the determination of Mother's status as an accomplice was crucial to determining [defendant's] guilt . . . ." We disagree.

First, as set forth above, Mother would come within the legal definition of "accomplice" only if she committed the identical offense – to wit, knowingly and maliciously preventing or dissuading R.L. from testifying. "Malice," in turn requires a showing that the defendant harbored "a wish to vex, annoy, or injure another person, or an intent to do a wrongful act . . . ." (§ 7, subd. (4).) Here, there is no evidence in the record Mother acted maliciously but for, arguably, her mere acceptance of money from defendant in exchange for trying to prevent R.L. from testifying. On the other hand, there is overwhelming evidence that she both accepted defendant's money and undertook efforts to prevent R.L. from testifying at his direction, not with the intent to wrongfully profit from his crime, because she was scared for herself and for R.L., and wanted to keep her entire family safe from defendant and his self-proclaimed mafia-like ties. In Mother's own words, she took the money and promised they would not testify because: "It was either that or he was going to do away with my daughter. That's the choice I had." Further, aside from Mother's repeated insistence that she acted out of fright, the prosecution's investigator testified that Mother was "nervous," "scared," and "very clear that she did not want to testify for fear of what might happened to [R.L.]" when he interviewed her in 2010 and early 2011. In addition, documentary evidence in the form of text messages and transcribed phone calls contained numerous threats and warnings by defendant to Mother, including that Mother should "get [R.L.] in control . . . [o]therwise, we will." While defendant's actions in these instances may have occurred after March 30 and 31, 2010, the dates charged in counts two and three, they nonetheless "tend[] to connect [him] with the commission of the crime" and, thus, constitute corroborating evidence for purposes of accomplice liability. (*People v. Miranda* (1987) 44 Cal.3d 57, 100 [for purposes of accomplice liability, corroborating evidence "may be slight and

34

entitled to little consideration when standing alone," and need not "establish every element of the offense charged"].)

As such, even if we were to conclude there was minimal evidentiary support for defendant's accomplice theory, such that instruction to the jury on accomplice liability was appropriate, there would nonetheless be no basis on this record for reversal. Not only is there sufficient evidence corroborating Mother's testimony to render harmless the court's failure to instruct on accomplice liability, even without such corroboration, there is no reasonable probability defendant would have achieved a better result at trial had the instructions been given. (*People v. Miranda, supra,* 44 Cal.3d at pp. 100-101. See also (*People v. Hamlin* (2009) 170 Cal.App.4th 1412, 1459 ["Absent a persuasive showing, based on the evidence, that a reasonable jury could have concluded S. [committed the identical offense], we must conclude that defendant has failed to show error in the failure of the trial court to give the jury accomplice instructions"]; *People v. Cooper* (1970) 10 Cal.App.3d 96, 103 [even where there is sufficient evidence to warrant a jury finding that the defendant had an accomplice, such that the trial court errs by not instructing on the law of accomplices, reversal is not required unless there is a reasonable probability that a result more favorable to the defendant would otherwise be reached].)

## IV. Sufficiency of the Evidence Defendant Dissuaded a Witness March 30-31, 2010.

Defendant next argues that, even if the trial court did not err in failing to instruct the jury on accomplice testimony, his conviction on counts two and three for dissuading R.L. from testifying on March 30 and 31, 2010 should nonetheless be overturned for insufficiency of the evidence. Specifically, defendant contends that, while there may have been evidence he arranged on those dates to pay Mother $1,000 to leave town, there is no evidence Mother told R.L. about his arrangements. As such, he says, the evidence at most supports conviction for attempted witness dissuasion, requiring reduction of his conviction on counts two and three to attempted witness dissuasion and remand for resentencing. We again disagree.

" 'The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the

defendant guilty beyond a reasonable doubt. [Citations.] On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.]' " (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.)

In applying this test, we keep in mind that substantial evidence must support each essential element of an offense. (*People v. Johnson, supra,* 26 Cal.3d at pp. 576-577.) " 'Although we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends. [Citation.] Thus, if the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder. [Citations.]' (*People* v. *Jones* (1990) 51 Cal.3d 294, 314 [270 Cal.Rptr. 611, 792 P.2d 643].)" (*People v. Ochoa*, *supra,* 6 Cal.4th at p. 1206.) As has often been stated, the sole function of this court on appeal is "to determine if *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. [Citations.]" (*People v. Lashley* (1991) 1 Cal.App.4th 938, 946.)

The charged offenses proscribed by section 136.1, subdivision (a)(1), consist of the following elements: (1) knowingly and (2) maliciously (3) preventing or dissuading a witness from attending or giving testimony at any trial, proceeding, or inquiry authorized by law. (§ 136.1, subd. (a)(1).) Having reviewed the record, we conclude the prosecution successfully proved these elements in counts two and three.

In particular, contrary to defendant's claim, the record reflects Mother testified under oath that, after defendant called her on March 30, 2010, she met him the next day in Oakland. During this March 31 meeting, defendant threatened her, stating that R.L. would not make it to trial if she testified. According to Mother, scared and believing they were in danger, she then called both R.L. and her older daughter. Specifically, the record reflects that when Mother was subsequently asked by the prosecutor to recall her testimony at the preliminary hearing regarding defendant's March 2010 threats and her relaying of those threats to R.L., she explained as follows:

36

"Q. Did you testify at the preliminary hearing that you believed [defendant's] threats because he knew everything about you?

"A. Yes.

"Q. Did you testify that the next date, March 31st, that you met him at Keller Plaza?

"A. Yes, I did.

"Q. Did you testify that he drove a green Prius hybrid?

"A. Yes.

"Q. And that he gave you $1,000?

"A. Yes.

"Q. On page 13 of the preliminary hearing [transcript], you identified the defendant at that preliminary hearing, is that correct?

"A. Yes.

"Q. You testified on Page 14 that he always said 'we'?

"A. Yes.

"Q. Did you testify that he always made it seem like he was working for the person, that he wasn't the person, he was working for someone else?

"A. Yes. [. . ¶¶ ]

"Q. Question from [the prosecutor], 'When he said 'we', what types of things did he tell you?' Answer at Line 25, 'Like stuff from the Mafia. Like if I ever seen the movies from the Mafia and that's what I'm dealing with and if we didn't participate with what he said, that that's what would happen to us. They were certain that day that the – that day that the Oakland P.D. works for them, that if we go to the police, that they would know, they would find out' Is that your – is that what you testified to at the preliminary hearing?"

"A. Yes. [. . . ¶¶ ]

"Q. At Line 6, you testified that, if we didn't, that it would get ugly?

"A. Yes."

"Q. *On Page 16, you were asked if you told R.L. -- 'the threats that you received from defendant, did you communicate those to R.L.'?*

*"A. Yes."*[28]  (Italics added.)

This testimony, we conclude, is sufficient to prove Mother told R.L. about defendant's efforts on March 30 and 31, 2010, to dissuade her from testifying. (*In re Frederick G.* (1979) 96 Cal.App.3d 353, 363 [reversal of a conviction for insufficiency of the evidence requires that it " 'clearly appear [from the record] that upon no hypothesis whatever is there sufficient substantial evidence to support it' "].)  While defendant disagrees, claiming this "very generalized testimony by Mother about conveying to R.L. [his] discussion with her" does not constitute sufficient evidence that Mother told R.L. about his threats on the charged dates of March 30 and 31, his argument ignores our standard of review.  Even if Mother's testimony could be interpreted as relating to defendant's threats on subsequent dates, the California Supreme Court has made clear: "Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends."[29]  (*People v. Maury* (2003) 30 Cal.4th 342, 403.)  While "it is the duty of the [trier of fact] to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the [trier of fact], not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt. ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment." ' "  (*People v. Bean* (1988) 46 Cal.3d 919, 932-933.)

---

[28]  Mother also testified that, when defendant told her a few weeks later to take R.L. to Texas, she asked R.L. to go and told her "there was a person stating that he was working for some people and wanted us to do such and such," including "[n]ot to testify." However, R.L. never made the trip because but "[she] didn't want to go." ~(4RT 575-576)

[29]  Indeed, to the extent Mother's testimony on this point was unclear, it was for defense counsel on cross-examination to clarify the record, not this court.

As such, there is no basis for disturbing the jury's findings that defendant was guilty of the offenses of dissuading a witness as charged in counts two and three. Simply put, viewing the evidence in the record in the light most favorable to the judgment as the law requires (*People v. Jackson* (1989) 49 Cal.3d 1170, 1200), there is sufficient evidence from which a rational jury could find beyond a reasonable doubt that defendant acted on March 30 and 31, 2010, to dissuade R.L. from testifying.

## V.    Assessment of Various Fines and Assessments.

Finally, defendant contends remand to the trial court is necessary because the fine imposed against him pursuant to Penal Code, section 290.3, subdivision (a), based upon his conviction on count one for committing a lewd act in May 2006 was improper. Specifically, defendant contends the trial court erred as a matter of law when imposing this fine in the amount of $800 because, in May 2006 when the offense was committed, section 290.3, subdivision (a), mandated a $200 fine for a first conviction for a qualifying sexual offense unless the court made a finding that the defendant lacked the ability to pay it. (Former Pen. Code, § 290.3, subd. (a) (Stats. 1995, c. 91, § 121.) Defendant thus seeks a reduction in his fine from $800 to $200.[30]

The prosecution correctly concedes the trial court's error in calculating the amount of this sex offender fine. (See *Collins v. Youngblood* (1990) 497 U.S. 37, 42 (italics added) [" 'any statute which punishes as a crime an act previously committed, which was innocent when done; *which makes more burdensome the punishment for a crime, after its commission*, or which deprives one charged with crime of any defense available according to law at the time when the act was committed, is prohibited as *ex post facto*' "]; *People v. McVickers* (1992) 4 Cal.4th 81, 84 ["Commonly understood definitions of punishment are intuitive: there is little dispute that additional jail time or

---

[30]    Penal Code, section 290.3, subdivision (a), currently states in relevant part: "Every person who is convicted of any offense specified in subdivision (c) of Section 290 shall, in addition to any imprisonment or fine, or both, imposed for commission of the underlying offense, be punished by a fine of three hundred dollars ($300) upon the first conviction . . . , unless the court determines that the defendant does not have the ability to pay the fine . . . ." (§ 290.3, subd. (a).)

extra fines are punishment"]. See also *People v. High* (2004) 119 Cal.App.4th 1192, 1196.) Nonetheless, while agreeing with defendant's request to reduce the fine to $200, the prosecution contends there are other related mandatory fines and assessments that the trial court failed in the first instance to impose against defendant. As such, the prosecution asks this court to remand the matter to the trial court to impose these additional penalties. We agree with this request. (*People v. Stewart* (2004) 117 Cal.App.4th 907, 910 [where the trial court erroneously failed to impose certain mandatory fines along with its imposition of a section 290.3 fine, remand to the trial court to correct this mistake was appropriate].) Accordingly, we remand this matter to the trial court to determine the appropriate fines and assessments to be levied against defendant based upon his conviction for having committed a lewd act against a child younger than 14 years in May 2006.

## DISPOSITION

This matter is remanded to the trial court for determination of the appropriate fines and assessments to be levied against defendant for his commission of a lewd act against a child younger than 14 years and, in all other regards, we affirm the judgment.

_____
Jenkins, J.

We concur:

_____
Pollak, Acting P. J.

_____
Siggins, J.

40